## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 13 2018, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Matter of the Involuntary Termination of the Parent-Child Relationship of D.W.;

J.W. (Mother)

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

July 13, 2018

Court of Appeals Case No.
49A02-1712-JT-2933

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Scott Stowers, Magistrate

Trial Court Cause No.
49D09-1610-JT-1104

**Pyle, Judge.**

# Statement of the Case

J.W. ("Mother") appeals the termination of the parent-child relationship with her daughter ("D.W."), claiming that there is insufficient evidence to support the termination because the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that the conditions that resulted in D.W.'s removal will not be remedied. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm the trial court's judgment.

We affirm.

# Issue

Whether there is sufficient evidence to support the termination of the parent-child relationship.

# Facts

Mother is the parent of D.W., who was born in October 2014. In September 2015, after being released from jail, a homeless and unemployed Mother went to her parents' home to pick up her daughter. Mother and Mother's mother ("Grandmother") became involved in a physical altercation in front of D.W. when Grandmother refused to allow Mother to leave the house with the eleven-month-old child. Mother was arrested and charged with battery resulting in bodily injury, criminal trespass, and battery in the presence of a child.

[4] That same day, DCS filed a petition alleging that D.W. was a Child in Need of Services ("CHINS"). The petition alleged that Mother was unable to provide D.W. with a "safe, stable, and appropriate living environment free from violence." (Ex. 11). The petition further alleged that Mother lacked stable housing, was unemployed and did not have the financial means necessary to provide D.W. with basic care and necessities. In addition, the petition alleged that D.W.'s father was "unknown." (Ex. 12).

[5] A November 2015 order stated that counsel for an incarcerated Mother ("Mother's Counsel") had attended a CHINS pre-trial hearing and had told the juvenile court that she had talked to Mother. Mother's Counsel submitted Mother's admission to an amended CHINS petition, which the order identified as Respondent's Exhibit A ("Exhibit A"). According to the order, the juvenile court accepted Mother's admission and adjudicated D.W. to be a CHINS.

[6] At some point following Mother's admission to the amended CHINS petition, Mother went directly from the Marion County Jail to an in-patient mental health treatment program at Richmond State Hospital ("Richmond State"). When Mother arrived at Richmond State, she exhibited manic symptoms, became easily agitated, and suffered from auditory and visual hallucinations.

[7] In December 2015, the juvenile court held a dispositional hearing and subsequently ordered Mother to participate in home-based therapy, home-based case management, and domestic violence services and to complete a parenting

assessment. Because Mother was in the inpatient program at Richmond State, she was unable to participate in the court-ordered programs at that time.

[8] In late December 2015 or early January 2016, Mother participated in supervised parenting time with D.W. at Richmond State. During the visit, Mother behaved erratically. Specifically, "[s]he burst into song several times, she started cursing several times, . . . at one point, she . . . had . . . pulled [D.W.'s] pants off and said [D.W.] wasn't fresh and started throwing powder and lotion on her." (Tr. 53). Mother then took a baby wipe and smeared the powder and lotion that covered D.W.'s body and hair. Mother also insisted that singer Chris Brown was D.W.'s father and told the eleven-month-old girl to write in a book that she had dedicated to him. The parenting time session was terminated because of Mother's inappropriate behavior.

[9] In October 2016, DCS filed a petition to terminate Mother's parental relationship with D.W. During the pendency of the proceedings, Mother was discharged from Richmond State in July 2017 and sent to a transitional group home. However, she was not properly medicated at the group home due to a "Medicaid glitch." (Tr. 35). A few weeks later, Mother was sent back to Richmond State after becoming involved in an altercation with another group home resident.

[10] After several delays and continuances, the juvenile court held a hearing on the termination petition in November 2017. At the time of the hearing, Mother was still a patient at Richmond State. Mother's case worker at Richmond State

testified that Mother had been diagnosed with a schizoaffective disorder, cannabis dependence, and a personality disorder not otherwise specified. The case worker explained Mother's diagnosis as follows:

> [E]ven when she is stable, she may still experience symptoms, which could be auditory or visual hallucinations or delusions . . . the idea of medication is to help her get to a place where she's able to better clarify what those things are and to not act on them in an inappropriate way. The idea is that the medication would help her to function despite those things.

(Tr. 38). The case worker further explained that Mother was on a discharge waiting list and should be moving to transitional housing in 90 days.

[11] Mother testified that D.W.'s father was T.D., who Mother claimed had raped her at gunpoint before getting a "record deal." (Tr. 11). She also claimed that D.W. was a "ten-month pregnancy" and that she had delivered D.W. herself. (Tr. 12). Mother further explained that Chris Brown was D.W.'s father.

[12] Also at the hearing, D.W.'s foster mother ("Foster Mother"), who is Mother's cousin, explained that then-three-year-old D.W. had lived with Foster Mother and her family for the previous two years. According to Foster Mother, D.W. called her "mom." (Tr. 47). Foster Mother further explained that it was her plan to adopt D.W.

[13] CASA Shaindel Kramer ("CASA Kramer") testified as follows regarding D.W.'s placement with her foster family:

> She's [a] very happy kid. . . . She's very social . . . every time I'm there, she comes up and says hi and wants to show me things, a very sweet kid, very smart, uh, I remember her talking and speaking very early on. . . . She just a very bright kid, and she is very attached to all the other siblings in the home too. She has a great relationship with them, they help take care of her, and she's in a very loving environment.

(Tr. 55-56). CASA Kramer recommended the termination of Mother's parental rights. She also explained that adoption was in D.W.'s best interests because the foster family was the only family and home that D.W. had ever known, and it would be traumatic for D.W. to be removed from that environment.

[14] In addition, GAL Sher'ron Anderson ("GAL Anderson") explained that Mother had not been able to complete the court-ordered services because Richmond State did not allow additional service providers in the facility. Mother had to stabilize her mental health and complete the Richmond State inpatient program before she could participate in the parenting programs. GAL Anderson also shared her concerns that Mother had never had stable housing or employment. She also recommended the termination of Mother's parental rights.

[15] According to DCS Family Case Manager Jessica Upshaw ("Case Manager Upshaw"), D.W.'s permanency plan had been changed from reunification to adoption because the conditions that had led to her removal had not been remedied. The case manager further testified that termination of parent-child relationship was in D.W.'s best interests so that she could have permanency

and stability through adoption. At the time of the hearing, Mother had not seen D.W. for almost two years.

[16] Following the hearing, the trial court issued a termination order, which concluded that DCS had met its burden of proving that there was a reasonable probability that the conditions that resulted in D.W.'s removal would not be remedied. Mother now appeals the termination.

## Decision

[17] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[18] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id*. Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly

erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[19] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1231.

[20] Here, Mother argues that there is insufficient evidence to support the termination of her parental rights. Specifically, she contends that the evidence is insufficient to show that there is a reasonable probability that the conditions that resulted in D.W.'s removal or the reasons for placement outside the

parent's home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to D.W.'s well-being.

[21] However, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in D.W.'s removal or the reasons for her placement outside Mother's home will not be remedied.

[22] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* DCS need not rule out all possibilities of change. *In re Kay. L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change. *Id.*

[23]     Here, our review of the evidence reveals that D.W. was removed from Mother following a physical altercation between Mother and Grandmother in the presence of D.W. Mother had just been released from jail and was unemployed and homeless. At the time of the termination hearing, Mother had spent most of the previous two years in an inpatient mental health treatment program at Richmond State. She had been placed in a group home for a few weeks but had ended up back at Richmond State after a physical altercation with another group home resident. GAL Anderson pointed out that Mother had never had stable housing or employment and recommended terminating her parental rights. Case Manager Upshaw pointed out that Mother had not seen D.W. for almost two years and that D.W.'s permanency plan had been changed from reunification to adoption because the conditions that had led to her removal had not been remedied. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in D.W.'s removal would not be remedied. There is sufficient evidence to support the termination of Mother's parental rights.[1]

---

[1] Mother also raises an additional issue concerning an alleged violation of her due process rights because (1) DCS did not admit the amended CHINS petition and Exhibit A into evidence at the termination hearing; and (2) the juvenile court terminated Mother's parental rights before D.W.'s father had been identified. However, Mother did not raise this issue to the trial court. She has therefore waived appellate review of it because a party may not raise an issue for the first time on appeal. *See In re K.S.*, 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (mother waived her claim that the trial court had violated her due process rights because she raised the constitutional issue for the first time on appeal); *Smith v. Marion County DPW*, 635 N.E.2d 1144, 1148 (Ind. Ct. App. 1994), *trans. denied*, (father waived his claim that the trial court had violated his constitutional right to appointed counsel during a CHINS proceeding because he presented the issue for the first time on appeal).

Affirmed.

Vaidik, C.J., and Barnes, Sr.J., concur.